UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LANITA GORDON,

       Plaintiff,

v.                                  Case No. 1:11-cv-941
                                  Hon. Paul L. Maloney

COMMISSIONER OF SOCIAL
SECURITY,

       Defendant.

_____/

**REPORT AND RECOMMENDATION**

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of the Social Security Administration (Commissioner) denying her claim for disability insurance benefits (DIB) and Supplemental Security Income (SSI).

Plaintiff was born on March 30, 1985 (AR 164).[1]  She has attended two years of college and is working on a bachelor's degree with a current grade point average of 3.9 (AR 32, 38, 177).  Plaintiff alleged a disability onset date of September 2, 2007 (AR 168).  She had previous employment as a dispatcher, secretary, home health aid worker, home  loan servicing consultant, movie concession worker and telemarketer (AR 39, 169).  Plaintiff identified her disabling conditions as bi-polar, depression and anxiety (AR 168).  According to plaintiff, her conditions result in frustration, racing thoughts, inability to concentrate, inability to keep track of information, violent reactions to other people, eating either too much or too little, wanting to sleep all day, and suicidal thoughts (AR 168). On March 19, 2010, an Administrative Law Judge (ALJ), reviewed plaintiff's

---

[1] Citations to the administrative record will be referenced as (AR "page #").

claim *de novo* and entered a decision denying benefits (AR 14-22). This decision, which was later approved by the Appeals Council, has become the final decision of the Commissioner and is now before the Court for review.

## I. LEGAL STANDARD

This court's review of the Commissioner's decision is typically focused on determining whether the Commissioner's findings are supported by substantial evidence. 42 U.S.C. §405(g); *McKnight v. Sullivan*, 927 F.2d 241 (6th Cir. 1990). "Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Secretary of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). A determination of substantiality of the evidence must be based upon the record taken as a whole. *Young v. Secretary of Health & Human Servs.*, 925 F.2d 146 (6th Cir. 1990).

The scope of this review is limited to an examination of the record only. This Court does not review the evidence *de novo*, make credibility determinations or weigh the evidence. *Brainard v. Secretary of Health & Human Services*, 889 F.2d 679, 681 (6th Cir. 1989). The fact that the record also contains evidence which would have supported a different conclusion does not undermine the Commissioner's decision so long as there is substantial support for that decision in the record. *Willbanks v. Secretary of Health & Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). Even if the reviewing court would resolve the dispute differently, the Commissioner's decision must stand if it is supported by substantial evidence. *Young*, 925 F.2d at 147.

A claimant must prove that he suffers from a disability in order to be entitled to benefits. A disability is established by showing that the claimant cannot engage in substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  *See* 20 C.F.R. §§ 404.1505 and 416.905; *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  In applying the above standard, the Commissioner has developed a five-step analysis:

> The Social Security Act requires the Secretary to follow a "five-step sequential process" for claims of disability.  First, plaintiff must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities."  Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience.  Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled.  For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled.

*Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001) (citations omitted).

The claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work through step four.  *Jones v. Commissioner of Social Security*, 336 F.3d 469, 474 (6th Cir. 2003).  However, at step five of the inquiry, "the burden shifts to the Commissioner to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile."  *Id.*  If it is determined that a claimant is or is not disabled at any point in the evaluation process, further review is not necessary.  *Mullis v. Bowen*, 861 F.2d 991, 993 (6th Cir. 1988).

The federal court's standard of review for SSI cases mirrors the standard applied in social security disability cases. *See Bailey v. Secretary of Health and Human Servs.*, No. 90-3265, 1991 WL 310 at * 3 (6th Cir. Jan. 3, 1991). "The proper inquiry in an application for SSI benefits is whether the plaintiff was disabled on or after her application date." *Casey v. Secretary of Health and Human Services*, 987 F.2d 1230, 1233 (6th Cir. 1993).

## II.  ALJ'S DECISION

Plaintiff's claim failed at the fifth step.  At step one, the ALJ found that plaintiff has not engaged in substantial gainful activity since the alleged onset date of September 2, 2007 and has met the insured status requirements of the Social Security Act through June 30, 2010 (AR 16).[2]  At step two, the ALJ found that plaintiff suffered from a severe impairment of bi-polar disorder (AR 16).  At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or equaled the requirements of the Listing of Impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1, specifically Listing 12.04 (affective disorders) (AR 17-18).

The ALJ decided at the fourth step that plaintiff has the residual functional capacity (RFC):

> to perform a full range of work at all exertional levels but with the following nonexertional limitations: limited to simple, routine and repetitive task in a work environment free of fast-paced production requirements; involving only simple work-related decisions; with few, if any, workplace changes; and no more than occasional interaction with the public or co-workers.

---

[2] The ALJ noted that plaintiff's records reflect that she performed some work in 2009 (AR 14, 16). Assuming that these earnings were posted correctly, plaintiff would be entitled to a last insured date of June 30, 2010 (AR 16).  If these were not posted correctly, then plaintiff would have a last insured date of December 31, 2009 (AR 14).  For purposes of his decision, the ALJ assumed that the earnings were posted correctly and assigned plaintiff the later last insured date (AR 16).

(AR 18).  The ALJ further found that plaintiff could not perform any of her past relevant work (AR 21).

At the fifth step, the ALJ determined that plaintiff could perform a significant number of unskilled work at all exertional levels in the national economy (AR 21-22).  Specifically, plaintiff could perform 30,700 jobs in the regional economy (defined as the lower peninsula of the state of Michigan) such as packager (4,100 jobs), laundry worker (3,000 jobs), machine operator (8,000 jobs), file clerk (4,600 jobs) and general office clerk (11,000 jobs) (AR 22, 58).  Accordingly, the ALJ determined that plaintiff has not been under a disability, as defined in the Social Security Act, from September 2, 2007 through the date of the decision (March 19, 2010) (AR 22).

### III.  ANALYSIS

Plaintiff has raised five issues on appeal.

**A.  The ALJ improperly failed to give controlling weight to the opinions of plaintiff's treating physicians contrary to 20 C.F.R. § 404.1527(d),** *Wilson v. Commissioner of Social Security***, 378 F.3d 541 (6th Cir. 2004) and** *Rogers v. Commissioner of Social Security***, 486 F.3d 234 (6th Cir. 2007).**

Plaintiff contends that the ALJ failed to give controlling weight to the opinions of three treating physicians, M.E. Slater, M.D., Marwan S. Tabbara, M.D. and Julia Ailabouni, M.D. Plaintiff's Brief at p. 10.  A treating physician's medical opinions and diagnoses are entitled to great weight in evaluating plaintiff's alleged disability.  *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001).  "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once."  *Walters v. Commissioner of Social Security*, 127 F.3d 525, 529-30 (6th Cir. 1997).  The agency regulations provide that if the Commissioner finds that a treating medical source's opinion on the issues of the nature and severity of a claimant's

5

impairments "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [the Commissioner] will give it controlling weight." *Walters*, 127 F.3d at 530, *quoting* 20 C.F.R. § 404.1527(d)(2).  An ALJ is not bound by the conclusory statements of doctors, particularly where the statements are unsupported by detailed objective criteria and documentation. *Buxton*, 246 F.3d at 773; *Cohen v. Secretary of Health & Human Servs.*, 964 F.2d 524, 528 (6th Cir. 1992).  In summary, the opinions of a treating physician "are only accorded great weight when they are supported by sufficient clinical findings and are consistent with the evidence." *Cutlip v. Secretary of Health and Human Services*, 25 F.3d 284, 287 (6th Cir. 1994); 20 C.F.R. § 404.1526.  Finally, the ALJ must articulate good reasons for not crediting the opinion of a treating source. *See Wilson v. Commissioner of Social Security*, 378 F.3d 541, 545 (6th Cir. 2004); 20 C.F.R. § 404.1527(d)(2) ("[w]e will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion").

### 1.    GAF Scores

Here, plaintiff points out that the three doctors diagnosed plaintiff with bi-polar disorder, depression, anxiety disorder or a combination of those disorders.  Plaintiff's Brief at p. 10. The thrust of plaintiff's argument is that the doctors assigned plaintiff Global Assessment of Functioning ("GAF") scores "well below 50," that such scores indicate that plaintiff's overall level of functioning is severely compromised and that ALJ erred because he failed to articulate good reasons for rejecting the GAF scores.[3]

---

[3] The GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning" on a hypothetical continuum of mental health-illness.  American Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR)*, (4th ed., text rev., 2000), pp. 32, 34.  The GAF score is taken from the GAF scale, which rates individuals' "psychological,

The ALJ noted that plaintiff had a three-day hospitalization in October 2007 after reports of suicidal ideation (AR  20, 252-62, 308-10).  Upon her admission to the hospital on October 19, 2007, two physicians (Farhan Jawed, M.D. and John Gherman, M.D.) assigned plaintiff a GAF score of 35 (AR 255).  On October 22, 2007, plaintiff was discharged from the hospital with an assigned GAF score of 45 (AR 308-10).  After examining plaintiff on October 25 and November 21, 2007, Dr. Tabbara assigned her GAF scores of 40 (AR 312, 327).  On January 6, 2010, Dr. Ailabouni assigned plaintiff a GAF score of 40  (based on an examination date of December 18, 2009) (AR 335-39).  The assigned GAF scores of 35 and 40 lie within the 31 to 40 range and indicate "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." *DSM-IV-TR* at p. 34.  The assigned GAF score of 45 lies within the 41 to 50 range, which indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.*

As an initial matter, plaintiff's reliance on the GAF scores as the basis for her disability claim is unfounded.  The Sixth Circuit has rejected the proposition that a determination of disability can be based solely on the unsupported, subjective determination of a GAF score. *See*

---

social, and occupational functioning," and "may be particularly useful in tracking the clinical progress of individuals in global terms." *Id*. at 32. The GAF scale ranges from 100 to 1. *Id*. at 34. At the high end of the scale, a  person with a GAF score of 100 to 91 has "no symptoms." *Id.*  At the low end of the GAF scale, a person with a GAF score of 10 to 1 indicates "[p]ersistent danger of hurting self or others (e.g., recurrent violence) OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death." *Id.*

*Rutter v. Commissioner of Social Security*, No. 95–1581, 1996 WL 397424 at *2 (6th Cir. July 15, 1996).  As the Sixth  Circuit explained in *Kennedy v. Astrue*, 247 Fed. Appx.761 (6th Cir.2007):

> GAF is a clinician's subjective rating of an individual's overall psychological functioning.  A GAF score may help an ALJ assess mental RFC, but it is not raw medical data.  Rather, it allows a mental health professional to turn medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning.

*Kennedy*, 247 Fed. Appx. at 766.   The Sixth Circuit has recognized that a GAF score "may have little or no bearing on the subject's social and occupational functioning," stating that "we are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score in the first place."  *Kornecky v. Commissioner of Social Security*, 167 Fed. Appx. 496, 511 (6th Cir.2006), citing *Howard v. Commissioner of Social Security*, 276 F.3d 235, 241 (6th Cir.2002). Rather, "the determination of disability must be made on the basis of the entire record and not on only some of the evidence to the exclusion of all other relevant evidence."  *Hardaway v. Secretary of Health & Human Services*, 823 F.2d 922, 927 (6th Cir.1987) (citation omitted).

### 2.    Plantiff's treatment with the three physicians (Drs. Tabarra, Slater and Ailabouni)

The ALJ reviewed plaintiff's treatment with Dr. Tabarra, noting that the doctor's treatment notes reflected that a diagnosis of bi-polar disorder (AR 20).  In November 2007, plaintiff announced to Dr. Tabarra that she was quitting her job and applying for disability benefits (AR 20, 285).   Dr. Tabarra's reflected that plaintiff lacked any significant mood or anxiety symptoms  in May 2008, that plaintiff stopped taking her medications in June 2008, that plaintiff had been symptom free during the summer and fall of 2008, but that she returned to the doctor in January 2009 complaining of increased symptoms (AR 20, 321, 325).  In May 2009 plaintiff reported no depressive symptoms and in September plaintiff reported that she had stopped working and was

enrolling in college full-time (AR 20, 318-20). The ALJ found that "Dr. Tabarra authored a note in July 2009 (Exh. 13F/1) stating that he had treated the claimant for bipolar disorder for the past six months and she could not function adequately or academically" (AR 20). The ALJ found this "non-specific opinion" of "limited value" because "it addresses a short period of time and does not reflect Dr. Tabarra's own notes of the claimant's improvement when on medications and relapses when she chooses to not follow his recommendation" (AR 20-21). Plaintiff went on Medicaid and sought assistance from Kalamazoo Community Mental Health in late 2009, when she suffered increased symptoms after ending a relationship with a significant other, coupled with alcohol and illicit drug use (AR 20, 334-44). Plaintiff was also not taking her prescribed medication (AR 20, 334-44). Plaintiff was back with Dr. Tabarra in December 2009, with reports of increased symptoms (AR 20, 317). In reviewing the record, the ALJ found that that Dr. Tabarra's assigned GAF scores seemed "unreasonably low" considering the doctor's office notes (AR 21).

Dr. Slater expressed in medical examination reports and treatment notes that plaintiff had no physical impairments and no limitations in her ability to read and write, but that plaintiff did have non-specific limitations in comprehension, sustained concentration, social interaction, memory and following simple directions (AR 20, 275-83). The ALJ gave Dr. Slater's opinions some weight (i.e., that plaintiff lacked a physical impairment and had some mental deficits) (AR 20). However, the ALJ noted that the doctor's opinions did not rule out unskilled work (AR 20, 275-83). Based on this record, the ALJ articulated good reasons for the weight assigned to the opinions of Drs. Tabarra and Slate.

The ALJ noted plaintiff's testimony that she was seeing Dr. Ailabouni, but did not specifically address the doctor's opinions expressed in a "Psychiatric Services/Evaluation" dated

January 6, 2010 (AR 19, 335-39).[4]  The record indicates that Dr. Ailabuoni evaluated plaintiff on

December 18, 2009 (AR  334-39).  While plaintiff testified that she was seeing Dr. Ailabouni (AR

36), the record reflects that she saw the doctor only once for an evaluation.  At that time, Dr.

Ailabouni assigned plaintiff a GAF score of 40 (AR 338). Given this limited record of Dr.

Ailabouni's involvement in plaintiff's treatment, which neither party fully explained in their briefs,

it does not appear under the circumstances that Dr. Ailabouni was a treating physician subject to the

*Wilson* articulation rule.  *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) ("[t]he treating

physician doctrine is based on the assumption that a medical professional who has dealt with a

claimant and his maladies over a long period of time will have a deeper insight into the medical

condition of the claimant than will a person who has examined a claimant but once, or who has only

seen the claimant's medical records").

Nevertheless, even if the court construed Dr. Ailabouni as a treating physician, the

ALJ's failure to cite a treating medical source is not an error requiring reversal if the decision is

supported by the record. *See Heston v. Commissioner of Social Security*, 245 F.3d 528, 534-35 (6th

Cir. 2001) (ALJ's failure to discuss a doctor's report was harmless error because the reviewing court

should consider all of the evidence in the record).  Here, plaintiff's claim of error with respect to Dr.

Ailabouni arises from the ALJ's failure to acknowledge the relatively low GAF score of 40 assigned

by Dr. Ailabouni's evaluation.  As discussed *supra*, a particular GAF score has little or no bearing

on the limitations to a claimant's occupational functioning.  A remand regarding the ALJ's failure

to address one of several similar GAF scores arrived at within a short period of time would not

change the result of the ALJ's decision.  *See Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989)

---

[4] The ALJ refers to the doctor as "Dr. Alabuini" (AR 19).

("[n]o principle of administrative law or common sense requires [a reviewing court] to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result").   Accordingly, plaintiff's claim of error should be denied.

> **B.  The ALJ improperly relied on the testimony of the vocational expert whose testimony was in response to hypothetical questions that did not accurately portray plaintiff's impairments contrary to *Bradford v. Secretary of Department of Health and Human Services*, 803 F.2d 871 (6th Cir. 1986).**

Plaintiff contends that the ALJ's hypothetical question posed to the vocational expert (VE) did not accurately portray her impairments.  An ALJ's finding that a plaintiff possesses the capacity to perform substantial gainful activity that exists in the national economy must be supported by substantial evidence that the plaintiff has the vocational qualifications to perform specific jobs. *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 779 (6th Cir. 1987).   This evidence may be produced through the testimony of a VE in response to a hypothetical question which accurately portrays the claimant's physical and mental limitations.   *See Webb v. Commissioner of Social Security*, 368 F.3d 629, 632 (6th Cir. 2004); *Varley*, 820 F.2d at 779. However, a hypothetical question need only include those limitations which the ALJ accepts as credible.  *See Blacha v. Secretary of Health and Human Services*, 927 F.2d 228,  231 (6th Cir. 1990).  *See also Stanley v. Secretary of Health and Human Services*, 39 F.3d 115, 118 (6th Cir. 1994) ("the ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals"). Because the purpose of the hypothetical question is to elicit testimony regarding a claimant's ability to perform other substantial gainful activity that exists in the national economy, the question does not need to include a listing of the claimant's medical diagnose.  "[A] hypothetical question need only

reference all of a claimant's limitations, without reference to the claimant's medical conditions." *Webb*, 368 F.3d at 632.

Plaintiff presents a vague summary of the ALJ's hypothetical questions posed to the VE and then contests the accuracy of the questions because the first question involved "solely physical exertional levels" which the ALJ "apparently adopted" as the basis for determining the jobs that plaintiff could perform. Plaintiff's Brief at p. 11. Plaintiff also mentions another hypothetical question which involved "a vague generalization as to the tolerance for employee absenteeism." Plaintiff's Brief at p. 12. Plaintiff then asserts that the ALJ never posed a hypothetical question to the VE that accurately portrayed her impairments. *Id.*

Plaintiff's characterization of the hypothetical questions posed is inaccurate. The ALJ's first hypothetical question contained the same exertional and nonexertional limitations as set forth in the RFC:

> For our first hypothetical assume the person of the claimant's age, education and work experience, is able to perform work at all exertional levels but that work is limited to simple routine and repetitive tasks and work environment free of fast-paced production requirements involving only simple work-related decisions with few if any workplace changes, only occasional interaction with the public and occasional interaction with co-workers.

(AR 57). The VE responded that such a person could not perform plaintiff's past relevant work (AR 57). However, based on these restrictions, the VE testified that such a person could perform 30,700 jobs in the regional economy (AR 57-58). In a follow-up hypothetical question regarding absenteeism, the VE testified that an employee who consistently missed work for two days per month would eventually lead to termination (AR 58).

Plaintiff's other objection was that the hypothetical question did not contain the limitations set forth in Dr. Slater's November 16, 20007 Medical Examination Report for the

Michigan Department of Human Services in which he indicated that plaintiff had mental limitations in all areas except "reading/writing" (i.e., she was limited in comprehension, memory, sustained concentration, following simple directions and social interaction) (AR 283). While Dr. Slater noted these extensive limitations on the Medical Examination Report, she did not expound on the extent to which these limitations affected plaintiff's ability to perform work-related activity, other than to state that plaintiff was bi-polar and seeing a psychiatrist (AR 283). In this regard, the court notes an incongruity between plaintiff attaining a 3.9 grade point average in college courses and Dr. Slater's opinion that she suffered from work-preclusive limitations in virtually every area of mental functioning. Accordingly, plaintiff's claim of error with respect to the hypothetical question should be denied.

### C. The ALJ failed to conduct a proper credibility analysis of plaintiff or plaintiff's witnesses contrary to SSR 96-7p and *Rogers*, 486 F.3d 234.

Plaintiff contends that the ALJ failed give specific reasons for finding that her testimony "concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual function capacity assessment" (AR 20). Plaintiff objects to the ALJ's credibility determination because the ALJ made a conclusory statement that her allegations were not credible, the ALJ failed to follow the requirements of SSR 96-7p, the ALJ failed to mention an unidentified letter from plaintiff's mother which corroborated plaintiff's claims. Plaintiff's Brief at p. 13. Plaintiff, however, does not support her objections by explaining: why the ALJ's credibility determination was conclusory; which requirements of SSR 96-7p the ALJ failed to follow; or how the mother's unidentified letter corroborates plaintiff's claims.

13

An ALJ may discount a claimant's credibility where the ALJ "finds contradictions among the medical records, claimant's testimony, and other evidence." *Walters*, 127 F.3d at 531. "It [i]s for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony." *Heston*, 245 F.3d at 536, *quoting Myers v. Richardson*, 471 F.2d 1265, 1267 (6th Cir. 1972). The court "may not disturb" an ALJ's credibility determination "absent [a] compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). The threshold for overturning an ALJ's credibility determination on appeal is so high, that in recent years, the Sixth Circuit has expressed in unpublished opinions that "[t]he ALJ's credibility findings are unchallengeable," *Payne v. Commissioner of Social Security*, No. 08-4706, 2010 WL 4810212 at *3 (6th Cir. Nov. 18, 2010), and that "[o]n appeal, we will not disturb a credibility determination made by the ALJ, the finder of fact" *Sullenger v. Commissioner of Social Security*, No. 07-5161, 2007 WL 4201273 at *7 (6th Cir. Nov. 28, 2007). Nevertheless, an ALJ's credibility determinations regarding subjective complaints must be reasonable and supported by substantial evidence. *Rogers v. Commissioner of Social Security*, 486 F.3d 234, 249 (6th Cir. 2007).

In her application, plaintiff claimed that she could not work because of frustration, racing thoughts and irritability (AR 18-19). Plaintiff stated that she could become violent when annoyed and experienced periods of mania and depression (AR 19). When she filed her appeal, plaintiff claimed that her condition had worsened, she had a greater amount of anxiety, and she had greater limitations in socializing with other people (AR 19). In her function report, plaintiff stated that she: sleeps a lot; turns on television to avoid being alone; eats; calls her friends; takes care of her personal needs; cooks; does household chores; has the ability to drive but chooses not to drive; goes shopping in stores and on-line and does so as often as she can; can spend the whole day

14

shopping; goes bowling; goes out to eat; goes to movies; plays cards; plays computer games; has difficulty properly handling her money; has difficulty getting along with others and becomes irritated or aggravated when she is around people for too long; her attention span varies with her mood, and sometimes she does not finish what she starts; and has lost jobs in the past due to arguing, anxiety and irritation (AR 19). Plaintiff testified at the hearing: that she maintained a 3.9 grade point average at a community college, while missing class 50-60% of the time; that she takes on-line classes at a four-year university; that she sees her mother and brothers regularly; that she has two close friends; that she does not do much on her own; that she uses the computer regularly for e-mail and school classes; that she drives when she has to shop or pick up her brother; that her mother comes to her apartment every other day to help with chores; that she gets intoxicated twice a month and has used Ecstasy in the past; that when she is manic she is very happy, does not sleep much and shops a lot; and that when she is depressed she says in bed and sleeps all day (AR 19).

The ALJ reached his credibility determination based upon plaintiff's daily activities and the medical record (AR 19-21). The ALJ summarized his findings as follows:

> In sum, the residual functional capacity assessment is supported by the evidence of record including the claimant's testimony to the extent it is consistent with the clinical evidence. Her symptoms are well controlled by medications when she follows the doctors' recommendations. Her difficulties with interpersonal relationships are not work-preclusive. Her allegations of severity are contradicted by her ability to live in her own apartment, to obtain a 3.9 grade point average and obtain an associates degree, and her engagement in social activities with friends.

(AR 21).

Based on this record, the ALJ's credibility determination is supported by substantial evidence. The ALJ has identified contradictions in plaintiff's testimony, the medical record and

other evidence. There is no "compelling reason" to disturb the ALJ's credibility determination. *Smith*, 307 F.3d at 379. Accordingly, plaintiff's claim of error should be denied.

### D. Substantial evidence supported a finding that plaintiff's bi-polar disorder met or medically equaled Listing 12.04.

Plaintiff contends that her bi-polar disorder meets or medically equals the requirements of Listings 12.04A, B or C. A claimant bears the burden of demonstrating that he meets or equals a listed impairment at the third step of the sequential evaluation. *Evans v. Secretary of Health & Human Services*, 820 F.2d 161, 164 (6th Cir.1987). In order to be considered disabled under the Listing of Impairments, "a claimant must establish that his condition either is permanent, is expected to result in death, or is expected to last at least 12 months, as well as show that his condition meets or equals one of the listed impairments." *Id.* An impairment satisfies the listing only when it manifests the specific findings described in the medical criteria for that particular impairment. 20 C.F.R. §§ 404.1525(d); 416.925(d). A claimant does not satisfy a particular listing unless all of the requirements of the listing are present. *See Hale v. Secretary of Health & Human Servs.*, 816 F.2d 1078, 1083 (6th Cir.1987); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir.1984). *See, e.g., Thacker v. Social Security Administration*, 93 Fed.Appx. 725, 728 (6th Cir 2004) ("[w]hen a claimant alleges that he meets or equals a listed impairment, he must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency"). If a claimant successfully carries this burden, the Commissioner will find the claimant disabled without considering the claimant's age, education and work experience. 20 C.F.R. §§ 404.1520(d); 416.920(d).

Listing 12.04 provides as follows:

16

12.04 Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A.  Medically documented persistence, either continuous or intermittent, of one of the following:

1. Depressive syndrome characterized by at least four of the following: a. Anhedonia or pervasive loss of interest in almost all activities; or b. Appetite disturbance with change in weight; or c. Sleep disturbance; or d. Psychomotor agitation or retardation; or e. Decreased energy; or f. Feelings of guilt or worthlessness; or g. Difficulty concentrating or thinking; or h. Thoughts of suicide; or i. Hallucinations, delusions or paranoid thinking; or

2. Manic syndrome characterized by at least three of the following: a. Hyperactivity; or b. Pressure of speech; or c. Flight of ideas; or d. Inflated self-esteem; or e. Decreased need for sleep; or f. Easy distractibility; or g. Involvement in activities that have a high probability of painful consequences which are not recognized; or h. Hallucinations, delusions or paranoid thinking;

Or

3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

And

B.  Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

17

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration;

Or

C.  Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 CFR Pt. 404, Subpt. P, App. 1.

The ALJ adopted the opinion of the state agency mental consultant, John Pai, M.D., that plaintiff's mental symptoms did not qualify under the Listings because the symptoms would not remain severe for 12 months (AR 21, 292).  The ALJ did not explicitly address the "A" criteria. Assuming that plaintiff met one of the numerous "A" criteria, the ALJ found that plaintiff did not meet the required "B" criteria, and adopted Dr. Pai's conclusions that plaintiff had "Mild" restriction

18

of activities of daily living, "Moderate" difficulties in maintaining social functioning, "Mild" difficulties in maintaining concentration, persistence or pace, and "One or Two" episodes of decompensation, each of extended duration (AR 17, 302).[5]  The ALJ also found that plaintiff did not satisfy the alternative "C" criteria, noting that "[t]he evidence demonstrates that while fully compliant with medication and treatment, including abstinence from drugs and alcohol, her condition is fairly well controlled, and not likely to result in decompensation or the need for a highly structured environment" (AR 17).

Plaintiff presents only generalized assertions that the ALJ erred in finding that she failed to meet the requirements of Listing 12.04.  Plaintiff glosses over the "A" criteria by stating that she "experiences nearly all of the depressive and manic characteristics listed in subparts 1 and 2" and relies on the unidentified letter from her mother to establish subpart 3.  Plaintiff's Brief at pp. 13-14.  Then, plaintiff relies on her GAF scores "below 50" as evidence that she has "'marked' or 'severe' limitations in most of [sic] not all of the four 'B' criteria under Listing 12.04B.  *Id.* at p. 14.  Finally, plaintiff relies on unidentified medical records and testimony (from her and her mother) to meet the "C" criteria, i.e., that her bi-polar condition has been chronic for at least two years and

_____

[5] The ALJ observed that plaintiff's counsel advanced a theory that she met the requirements of Listing 12.04 but:

"He [counsel] makes no specific assertion of marked or extreme paragraph B criteria.  He notes indications of significant deficits in maintaining concentration, persistence or pace, as well as social function, without recognition of the need for 12-month duration of such deficits.  He also posits that because she prefers to be in the company of her friends or her mother she requires a highly structured and supportive environment.  The Listings acknowledge that such structure and support can exist outside of an institutional setting, but to meet this requirement one must be unable to function outside of the home.  She reports she can go out alone, goes shopping, goes to movies and bowling (Ex 11E) and during the period under consideration she has gone to college classes and done quite well.  She goes to friends' apartments and socializes with them." (AR 17-18).

has significantly interfered with her schooling, ability to maintain employment and function generally. *Id.*

Plaintiff has failed to demonstrate that she meets or equals the requirements Listing 12.04. Assuming that plaintiff met one of the "A" criteria under Listing 12.04, she failed to demonstrate that she met the required "B" criteria. "The GAF scale . . . does not have a direct correlation to the severity requirements in our mental disorders listings." *Oliver v. Commissioner of Social Security*, 415 Fed. Appx. 681, 684 (6th Cir. 2011), quoting Response to Comment, Final Rules on Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 FR 50746, 50764–65 (Aug. 21, 2000). In addition, plaintiff has not demonstrated that she met the "C" criteria, setting forth only the most skeletal argument with respect to this issue. A court need not make the lawyer's case by scouring the party's various submissions to piece together appropriate arguments. *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995). "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997). Accordingly, plaintiff's claim should be denied.

### E. The ALJ was derelict in his duty to fully and fairly consider all the relevant evidence and material evidence contrary to *Richardson v. Perales*, 403 U.S. 389 (1971) and *Lashley v. Secretary of Health and Human Services*, 708 F.2d 1048 (6th Cir. 1983).

### 1.   The ALJ "cherry picked" evidence

Plaintiff claims that the ALJ failed to conduct a full and fair hearing by "picking and choosing" only that evidence which supports his decision. Her arguments restate previously raised

arguments (e.g., the ALJ's rejection of Dr. Tabarra's opinions, the ALJ's treatment of the GAF scores, and that the ALJ "never presented a hypothetical question to the vocational expert with reference to the effects of her mental impairments").  Plaintiff's Brief at pp. 15-16.  The court disagrees.  It is well established that "Social Security proceedings are inquisitorial rather than adversarial" and that "[it] is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." *Sims v. Apfel*, 530 U.S. 103, 110-111 (2000).  The Commissioner must also provide a statement of evidence and reasons on which the decision is based.  *See* 42 U.S.C. § 405(b)(1).  However, it is unnecessary for the ALJ to address every piece of medical evidence.  *See Heston*, 245 F.3d at 534-35.  Viewing the record as a whole, the court concludes that the ALJ did not "cherry pick" the evidence, but rather investigated the facts and provided a statement of reasons on which his decision is based.

### 2.      The ALJ's duty to re-contact Dr. Tabarra

Plaintiff contends that the ALJ had a duty to re-contact Dr. Tabarra after finding that the doctor's GAF assessments conflicted with his treatment notes, citing 20 C.F.R. § 404.1512.  The court disagrees.  The applicable section, 20 C.F.R. § 404.1512(e) ("Evidence"), provides as follows:

> (e) Recontacting medical sources.  When the evidence we receive from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled, we will need additional information to reach a determination or a decision.  To obtain the information, we will take the following actions.

> (1) We will first recontact your treating physician or psychologist or other medical source to determine whether the additional information we need is readily available.  We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.  We may do this by requesting copies of your

21

medical source's records, a new report, or a more detailed report from your medical source, including your treating source, or by telephoning your medical source.  In every instance where medical evidence is obtained over the telephone, the telephone report will be sent to the source for review, signature and return.

(2) We may not seek additional evidence or clarification from a medical source when we know from past experience that the source either cannot or will not provide the necessary findings.

20 C.F.R.  § 404.1512(e).

Plaintiff does not address how § 404.1512(e) applies to her case.  The fact that an ALJ finds discrepancies in a physician's report does not automatically trigger a duty to re-contact that doctor.  Under  § 404.1512(e) and Social Security Ruling (SSR) 96-5p, two conditions  must be met to trigger the duty to re-contact a physician: "the evidence does not support a treating source's opinion . . . *and* the adjudicator cannot ascertain the basis of the opinion from the record." *Ferguson v. Commissioner of Social Security*, 628 F.3d 269, 272-73 (6th Cir. 2010) (emphasis in original).[6]  Here, the ALJ could ascertain the basis of Dr. Tabarra's opinion by reviewing the doctor's records.  Based on those records, the ALJ determined that the doctor's opinion regarding plaintiff's GAF score of 40 was "unreasonably low" considering the doctor's office notes  (AR 21).  It is well established that an ALJ may reject a treating doctor's opinion on the ground that the opinion is unsupported by the doctor's treatment notes.  *See Cutlip*, 25 F.3d at 287 (the opinions of a treating physician "are only accorded great weight when they are supported by sufficient clinical findings and are consistent with the evidence").  The medical evidence of record was sufficiently adequate to allow the ALJ to reach a determination on plaintiff's claim of disability and plaintiff did

_____

[6] SSR's "are binding on all components of the Social Security Administration" and "represent precedent final opinions and orders and statements of policy and interpretations" adopted by the agency.  20 C.F.R. § 402.35(b)(1).

not meet the conditions necessary to trigger the ALJ's duty to re-contact Dr. Tabarra. Accordingly,

plaintiff's claim of error should be denied.

### IV.    Recommendation

Accordingly, I respectfully recommend that the Commissioner's decision be

**AFFIRMED**.


Dated:  June 15, 2012                          /s/ Hugh W. Brenneman, Jr.
                                               HUGH W. BRENNEMAN, JR.
                                               United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk
of the Court within fourteen (14) days after service of the report.  All objections and responses to
objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections
within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474
U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).